UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN ADMIRALTY

GLORY WEALTH SHIPPING PTE LTD.

              Plaintiff,                        CASE NO.: 8-09-cv-02585-T-30TBM

v.

PENINSULA ENTERPRISE, S.p.A.,

_____Defendant._____/

COMPASS ROSE SHIPPING, LTD.,

              Plaintiff,

v.

M/V MARIANO LAURO, her engines, boilers,
tackle, etc., *in rem* and
PENINSULA SHIPPING & TRADING, Srl
a foreign corporation,

_____Defendants._____/

EXUMA NAVIGATION COMPANY INC.
OF FLORIDA,

              Intervening Plaintiff.

_____/

## VERIFIED COMPLAINT

      Plaintiff, Exuma Navigation Company Inc. of Florida ("Exuma"), by and through its undersigned counsel, and for its Verified Complaint sues defendants, Peninsula Enterprise S.p.A. ("Peninsula Enterprise") and Peninsula Shipping & Trading S.P.A. ("Peninsula Shipping"), and alleges upon information and belief as follows:

1.      This is an action for breach of a maritime contract which is an admiralty and maritime claim brought pursuant to this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333,  Rule 9(h) of the Federal Rules of Civil Procedure and Supplemental Rule B.

2.      Exuma seeks an order and writ of attachment against the vessel MARIANO LAURO and her appurtenances which is maritime property owned by Defendants and presently located within the district of this Court.

3.      Plaintiff, Exuma is a Florida corporation with its principal place of business at 4371 Northlake Boulevard, Palm Beach Gardens, Florida.

4.      Defendant, Peninsula Enterprise was the disponent owner of the vessel MEVLUT DOVEN, and upon information and belief was and is an Italian corporation or business entity which maintains its principal place of business in Sorrento Italy.   Defendant, Peninsula Enterprise cannot be found within the district.

5.      Defendant, Peninsula Shipping is, upon information and belief an Italian corporation or business entity which maintains its principal place of business in Sorrento Italy. Defendant, Peninsula Shipping cannot be found within the district.

6.      Upon further information and belief and as more fully set out below, Peninsula Shipping is the alter ego of Peninsula Enterprise.

### Facts Common to All Counts

7.      On or about November 6, 2007, Peninsula Enterprise entered into a Time Charter with Exuma.  (See Exhibit A).  The Time Charter provided that Exuma would charter the motor vessel MEVLUT DOVEN for "12 months/15 days more or less in Charterers' option" with "6/6 option 6 months 15 days more or less in Charterers' option on each period."

8.      The vessel was, in fact, chartered by Peninsula Enterprise to Exuma.  Exuma re-delivered the Vessel to Peninsula Enterprise in accordance with the provisions of clause 51 of the Time Charter.  In that regard, a notice of cancellation of the Time Charter was sent from Exuma to Peninsula Enterprise t November 2008.  Peninsula Enterprise accepted re-delivery of the Vessel off the coast of Panama.

9.      As a result, Exuma had a claim against Peninsula Enterprise for an outstanding balance owed for charter hire, bunkers and other debts in the amount of $243,869.24.

10.     In addition to this claim, Exuma has a claim for $1,467,779.70 for loss of earnings during the remainder of the charter period.

11.     On October, 2, 2009, an arbitration tribunal in London issued a First Final Arbitration Award in favor of Exuma and against Peninsula Enterprises for $243,869.24 which is scheduled to bear interest at 4% compounded quarterly since February 12, 2009 (approximately $9,902.07 as of April 6, 2010), plus the tribunal's costs £3,470.00 (approximately $5,256.08 at current exchange rates).  (Exhibit B).

12.     As a regular feature of English law and arbitration, attorney's fees are awarded to the successful party, along with costs and interest, which is considered damages in admiralty and properly sued for herein.

13.     The First Final Arbitration Award reserves ruling on the claim for loss of earnings in the amount of $1,467,779.70 for future determination.

### Count I – Breach of Contract Against Peninsula Enterprises

14.     Plaintiff incorporates herein paragraphs 1 through 12 of the Verified Complaint as is fully set forth herein.

15.     The Time Charter agreement entered into on November 6, 2007, between Exuma and Peninsula Enterprise for the vessel MEVLUT DOVEN is a binding and enforceable maritime contract.

16.     Exuma agreed to charter the MEVLUT DOVEN from Peninsula Enterprise and did so in full compliance with its duties and obligations under the explicit terms of the November 6, 2007 Time Charter agreement.

17.     In consideration for the charter of the MEVLUT DOVEN, Peninsula Enterprise agreed to perform by, among other things, making making the vessel available to Exuma for the term of the contract and having it perform according to Exuma's lawful instructions including the transportation of cargoes arranged by Exuma and/or those with whom Exuma contracted.

18.     Exuma has fully performed its obligations under the applicable Time Charter.

19.     Peninsula Enterprise failed to perform its obligations under the charter party by, among other things, failing to provide a seaworthy vessel which was suitable to meet the obligations under the Time Charter.

20.     As a result of the foregoing, Peninsula Enterprise materially breached the Time Charter.

21.     Exuma has been damaged in the amount of $259,027.39 as set forth above and established by the Arbitration Tribunal.  In addition, Exuma has sustained damages for loss of earnings in the amount of $1,467,779.70.

22.     Exuma has been damaged and continues to be damaged as a direct result of Peninsula Enterprise's breach of the Charter Agreement.

23.     Exuma is entitled to recover interest, costs and attorney's fees incurred in this action pursuant to the terms of the Time Charter under English law.

24.     The total amount of Exuma's claims for breach of the Time Charter is approximately $1,726,807.09 which does not include attorney's fees or costs associated with this action or the on going costs and attorney's fees associated with the London Arbitration.

### Count II – Peninsula Shipping Is The Alter-Ego of Peninsula Enterprise

25.     Plaintiff incorporates herein paragraphs 1 through 12 of the Verified Complaint as is fully set forth herein.  The allegations in this Count are alleged upon information and belief.

26.     On November 2009, Peninsula Enterprise had a share capital of approximately 3,978,000 EURO.

27.     The M/V MARIANO LAURO (IMO 9331804) was purchased by Peninsula Enterprise in February 2006.  Peninsula Enterprise remained the registered owner of the vessel until October 23, 2008.

28.     The M/V MARIANO LAURO (IMO 9331804) has one mortgage registered against the vessel, dated February 27, 2006, for the sum of $13,600,000, which is held in favor of Banca Antonveneta S.p.a.

29.     Beginning in March 2008, and continuing through the date of this suit, Peninsula Enterprise allegedly began defaulting on its charter party agreements, and numerous lawsuits were commenced in the United States District Court for the Southern District of New York seeking attachment of funds for breach of charter party agreements.

30.     As a result of the aforementioned lawsuits and attempts to attach property of Peninsula Enterprise, said defendant began the process of transferring the vessel in October 2008 to a straw company.

31.     On October 21, 2008, Peninsula Shipping was incorporated in Italy.

32.     Peninsula Shipping has the same registered address as Peninsula Enterprise.

33.     Peninsula Enterprise is the sole shareholder of Peninsula Shipping and owns 100% of the company.

34.     Peninsula Shipping was incorporated with a capital share of just 10,000 EURO.

35.     Peninsula Shipping has a sole director identified as Federico Cuomo, who is also listed as the administrator of Peninsula Enterprise.

36.     On or about October 23, 2008, the MARIANO LAURO was sold by Peninsula Enterprise to Peninsula Shipping.

37.     Following the sale of the vessel from Peninsula Enterprise to Peninsula Shipping, Peninsula Enterprise remained manager of the vessel.

38.     Peninsula Enterprise's creation of Peninsula Shipping and the subsequent transfer of the vessel to Peninsula Shipping was effected by Peninsula Enterprise for the sole purpose of perpetrating a fraud by fraudulently transferring the MARIANO LAURO to Peninsula Shipping to avoid its known creditors, including Exuma.

39.     In addition, Peninsula Enterprise completely dominates Peninsula Shipping and disregards its corporate forms such that Peninsula Enterprise fully controls all operations of the vessel and Peninsula Shipping is an inadequately capitalized shell of a corporation.

40.     As a result of the fraudulent nature of Peninsula Shipping's creation and ownership of the MARIANO LAURO and Peninsula Enterprise's complete disregard of its corporate form and undercapitalization, Peninsula Shipping's corporate form should be disregarded and the MARIANO LAURO be treated as property of its true owner, Peninsula Enterprise.

### COUNT III –Rule B Attachment of MARIANO LAURO

41.     Plaintiff incorporates herein paragraphs 1 through 12 of the Verified Complaint as is fully set forth herein.

42.     Exuma files this maritime attachment proceeding for the purpose of obtaining security for its claims of breach of maritime contract, interest, anticipated fees and costs.

43.     Exuma alleges, upon information and belief, that none of the officers of the defendants are now within this District and that the Defendants do not maintain a place of business here nor are or will be within the District during the pendency of this case.

44.     Accordingly, Exuma seeks to attach the MARIANO LAURO and any other assets within this District in accordance with Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

45.     The amount sought to be attached pursuant to the allegations above is $1,726,807.09 .

WHEREFORE Plaintiff prays:

1.     That Process in due form of law according to the practice of this Court may issue against the Defendants Peninsula Enterprise and Peninsula Shipping, citing them to appear and answer under oath all and singular the matters alleged, failing which a default may be taken against them;

2.     That since the Defendants cannot be found within this District pursuant to Supplemental Rule B, that all the assets of the Defendants presently within this District, or assets expected in this District during the pendency of this action, including the MARIANO LAURO and/or any assets within the possession, custody or control of any other garnishee upon whom a copy of the Process of Maritime Attachment and Garnishment issued in this action may be served, be attached and garnished.

3.      That Plaintiff, Exuma, recover judgment against Defendants, Peninsula Enterprise and Peninsula Shipping, in the amount of $1,467,779.70 and enforce the arbitration award in the present approximate amount of $259,027.39 which continues to accrue interest; and

4.      That Exuma be granted such other or further or different relief as this Court may deem just and proper.

DATED this _____ day of April ___, 2010.

/s/ Anthony J. Cuva_____
Anthony J. Cuva
Florida Bar No. 896251
AKERMAN, SENTERFITT.
401 East Jackson Street, Suite 1700
Tampa, Florida 33602
Telephone: (813) 223-7333
Facsimile: (813) 223-2837
*Attorney for Exuma Navigation*

## Certificate of Service

I hereby certify that on the _____ day or April, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record by; CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic notices.

_/s/ Anthony J. Cuva_____
Anthony J. Cuva

## <u>VERIFICATION</u>

STATE OF _____

COUNTY OF _____

_____, being duly sworn, deposes and says that he/she is the

_____ of Exuma Navigation Company, Inc. and that he/she has read the

foregoing Verified Complaint and knows the contents thereof, and that same is true to his/her

knowledge, except as to those matters stated to be upon information and belief, and to those

matters he/she believes them to be true; and that the sources of his/her information and grounds

for his/her belief as to those matters stated in the Complaint is a review of the invoices and

his/her personal knowledge.

_____

The foregoing instrument was acknowledged before me this _____ day of April , 2010,

by, _____, _____ who is personally known to me or _____ who has produced as

identification (check one).

_____
Notary Public
_____
Print Name

My Commission Expires:

## VERIFICATION

STATE OF FLORIDA

COUNTY OF PALM BEACH

WIM HULSKER, being duly sworn, deposes and says that he is the vice president of Exuma Navigation Company, Inc. and that he has read the foregoing Verified Complaint and knows the contents thereof, and that same is true to his knowledge, except as to those matters stated to be upon information and belief, and to those matters he believes them to be true; and that the sources of his information and grounds for his belief as to those matters stated in the Complaint is a review of the relevant document and his personal knowledge.



The foregoing instrument was acknowledged before me this 30 day of April, 2010, by, Wilhelm Hulsker   who is personally known to me or ✓ who has produced as identification (check one). FLDL H426 SS 147 13>0

_____
Notary Public

_____
Print Name

My Commission Expires: 12-28-2010

NANCY L. ALLEN
Notary Public - State of Florida
My Commission Expires Dec 28, 2010
Commission # DD 623744
Bonded Through National Notary Assn.

9

# EXHIBIT A

Code Name: **"NYPE 93"**

Recommended by:
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

# TIME CHARTER©
### New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U. S.A.), Inc.*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th 1993.

| | |
|---|---|
| 1 | **THIS CHARTER PARTY**, made and concluded in *Rotterdam* |
| 2 | This       *6ᵗʰ*       day **of** *November    , 2007* |
| 3 | **Between**  *: Disponent Owners : Messrs. Peninsula Enterprise Spa, Sorrento, Naples, Italy* |
| 4 | |
| 5 | T/C <u>Owners</u> of the Vessel described below, and **Messrs. Exuma Navigation Company Inc, Florida** |
| 6 | |
| 7 | as Charterers |
| 8 | |
| 9 | **Description of Vessel** "MEVLUT DOVEN" ex "MARINE PRIDE" SEE RIDER CL. NO. 85 |
| 10 | ~~Name~~                    ~~Flag~~                    ~~Built~~                                    ~~(year).~~ |
| 11 | ~~Port and number of Registry~~ |
| 12 | ~~Classed~~                                                            ~~in~~ |
| 13 | ~~Deadweight~~                                    ~~long*/metric* tons (cargo and bunkers, including freshwater and~~ |
| 14 | ~~stores not exceeding~~                        ~~long*/metric* tons) on a salt water draft of~~ |
| 15 | ~~on summer freeboard.~~ |
| 16 | ~~Capacity~~                        ~~cubic feet grain~~                                ~~cubic feet bale space~~ |
| 17 | ~~Tonnage~~                        ~~GT/NRT~~ |
| 18 | ~~Speed about~~                    ~~knots, fully laden, in good weather conditions up to and including maximum~~ |
| 19 | ~~Force~~            ~~on the Beaufort wind scale, on a consumption of about~~                    ~~long*/metric*~~ |
| 20 | ~~tons of~~ |
| 21 | *Delete as appropriate. |
| 22 | * For further description see Appendix "A" (if applicable) |
| 23 | **1.  Duration** |
| 24 | The  Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period |
| 25 | of  *12 months / 15 days more or less in Charterers' option further options in Charterers' option 6 / option 6 months* |
| 26 | *15 days more or less in Charterers' option on each period* |
| 27 | |
| 28 | within below mentioned trading limits. |
| 29 | **2.  Delivery** |
| 30 | The Vessel shall be placed at the disposal of the Charterers at *one safe port Algeçiras, Spain,* |
| 31 | *any time day or night, Sundays and Holidays included, on DLOSP.* |
| 32 | |
| 33 | The  Vessel  on  her delivery shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in |
| 34 | every  way fitted for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling |
| 35 | gear simultaneously |
| 36 | |
| 37 | The Owners shall give the Charterers  not  less  than *15 days notice ~~of expected date of~~ and endeavour to* |
| | *give even more details if at all possible. The Owners shall give Charterers not less than 5/3/2/1 day(s) of* |
| | *expected date of* |
| 38 | delivery . |

This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S.A.). Inc., using the BIMCO Charter Party Editor.
Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original ASBA
approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document

39  **3. On-Off Hire Survey**
40  Prior to delivery and redelivery the parties shall, unless otherwise agreed, each appoint surveyors, for their
.41  respective accounts, who shall not later than at first loading port/last discharging port respectively, conduct
42  joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition
43  of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without
44  prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.
45  If either party fails to have a representative attend the survey and sign the joint survey report,  such party
46  shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.
47  On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.*Owners to have the option to*
*appoint Master or Ch. Eng. to act as their surveyors*

48  **4. Dangerous Cargo/Cargo Exclusions**

49  (a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of dangerous,
50  injurious, flammable of corrosive nature unless carried in accordance with the requirements or
51  recommendations of the competent authorities of the country of the Vessel's registry and of ports  of
52  shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must
53  pass. Without prejudice to the generality of the foregoing, in addition the following are specifically
54  excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials.
55  *See rider Cl. No. 46*
56
57
58
59
60
61
62
63
64
65  ~~(b) If  IMO classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~
66  ~~————————————— tons and the Charterers shall provide the Master with any evidence he may~~
67  ~~reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO~~
68  ~~regulations, failing which the Master is entitled to refuse such cargo or,  if already loaded,  to unload  it at~~
69  ~~the Charterers' risk and expense.~~

70  **5. Trading Limits** *See rider Cl. No. 47*

71  ~~The Vessel shall be employed in such lawful trades between safe ports and safe places~~
72  ~~within~~
73                                                                                    ~~excluding~~
74
75
76                                                                      ~~as the Charterer's shall direct~~

77  **6. Owners to Provide**
*The vessel to be delivered with deratisation certificate on board and valid for a minimum period*
*of 6 months from delivery. Any renewal during the currency of the charter to be for Owners' account.*
78  The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for
79  all  provisions, cabin, deck,  engine-room and other necessary stores, including boiler water, shall pay for
80  wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the
81  crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and .
82  equipment for and during the service, and have full complement of officers and crew

83  **7. Charterers to Provide**

84  The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise
85  agreed; shall pay for port charges (including compulsory watchmen  and cargo watchmen  and compulsory
86  garbage disposal), all communication expenses pertaining to the Charterers' business at cost, pilotages,
87  towages, agencies, commissions, consular charges  (except those pertaining to individual crew members

This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S.A.), Inc., using the BIMCO Charter Party Editor.   2
Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document,  which is not clearly visible, the original ASBA
approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document

NYPE 93 Page

88 or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel
89 puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all
90 such charges incurred shall be paid by the Owners. Fumigation ordered because of illness of the crew
91 shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while
92 the Vessel is employed under this Charter Party shall be for the Charterer's' account All other fumigation
93 shall be for the Charter's' account after the Vessel has been on charter for a continuous period of six
94 months or more.

95 The Charterers shall  provide  and  pay for necessary dunnage and also  any  extra fittings  requisite for a
96 special trade or unusual cargo, but the Owners shall allow them the use of any dunnage *and lashing material*
   already aboard
97 the Vessel. Prior to redelivery the Charter's shall remove their dunnage and fittings at their cost and in
98 their time.

99 **8.  Performance of Voyages**

100 (a) The Master shall perform the voyages with due despatch, and shall render all customary assistance
101 with the Vessel's crew. The Master shall be conversant with the English language and (although
102 appointed by the Owners)  shall be under the orders and directions of  the Charterers as regards
103 employment and agency; and the Charterers shall perform all cargo handling, including but not limited to
104 loading, stowing, trimming, lashing, securing, dunnaging,  unlashing, discharging, and tallying, at their risk
105 and expense, under the supervision of the Master.

106 (b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or
107 officers, the Owners  shall, on receiving particulars of the complaint, investigate the same,   and, if
108 necessary, make a change in the appointments.

109 9.  **Bunkers** *See rider Cl. No. 59*

110 ~~(a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and~~
111 ~~diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with~~
112 ~~long*/metric* tons of fuel oil at the price of              per ton;~~
113 ~~tons of diesel oil at the price of          per ton. The vessel shall~~
114 ~~be redelivered with:          tons of fuel oil at the price of          per ton;~~
115 ~~tons of diesel oil at the price of          per ton.~~

116 * Same tons apply throughout this clause.
117 (b)  *Whilst on hire* t~~he~~ Charterers shall supply bunkers of a quality suitable for  burning in the Vessel's engines
118 and auxiliaries ~~and which conform to the specification(s) as set out in Appendix A.~~

119 The Owners reserve their right to make a claim against the Charterers for any damage to the main engines
120 or the auxiliaries  caused  by  the  use  of unsuitable  fuels  or  fuels  not  complying  with  the  agreed
121 specification(s).  Additionally,  if  bunker  fuels  supplied  do  not  conform  with  the  mutually  agreed
122 specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners
123 shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker
124 consumption, nor for any time lost and any other consequences.

125 10.  **Rate of Hire/Redelivery Areas and Notices**
126 The Charterers shall pay for the use and hire of the said Vessel at the rate of
127 U.S. currency, daily, ~~or $                                   U.S. currency per ton on the Vessel's total deadweight~~
128 ~~carrying capacity, including bunkers and stores, on              summer freeboard, per 30 days,~~
129 commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part
130 of a month; hire shall continue until the hour of the day of her redelivery in like good order and condition,
131 ordinary wear and tear excepted, to the Owners (unless Vessel lost) at- *DLOSP Full Med/Black Sea /*
132 *Continent/Skaw range*
133
134                                unless otherwise mutually agreed
135 The Charterers shall give the Owners not less than   *15/10/5*   days *approximate* notice ~~of the Vessel's~~
136 ~~expected date and probable port of redelivery.~~*and 3/2/1 day(s) definitive notice of the Vessel's expected*
   *date and probable port of redelivery.*

This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S.A.) Inc., using the BIMCO Charter Party Editor.
Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original ASBA
approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document

3

137  For the purpose of hire calculations,  the times of delivery,  redelivery or termination of charter shall be
138  adjusted to GMT.

139  **11.  Hire Payment**

140  (a)  *Payment*
141  Payment of Hire shall be made so as to be received by the Owners or their designated payee ~~in~~
142  **See rider Cl. 77**                                                    ~~viz~~
143
144
145                                                                         ~~in~~
146  ~~currency, or~~ in United States Currency, in funds available to the
147  Owners on the due date, 15 days in advance, and for the last month or part of same the approximate
148  amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day
149  as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,
150  or on any  fundamental breach whatsoever  of this Charter Party, the Owners shall be at liberty to
151  withdraw the Vessel from the service of the Charterer's without prejudice to any claims they (the Owners)
152  may otherwise have on the Charterers.

153  At any time after the expiry of the grace period provided in Sub-clause 11  (b) hereunder and while the
154  hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold
155  the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever
156  for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire
157  shall  continue to  accrue and any extra expenses resulting from such withholding shall be for  the
158  Charterers' account

159  (b)  *Grace Period*

160  Where there is failure to make punctual and regular payment of hire due to oversight, negligence,  errors
161  or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners
162  *3 (Three)*              clear banking days (as recognised at the agreed place of payment) written notice to rectify the
163  failure, and when so rectified within those *3 (Three)*  days following the Owners' notice, the payment
164  shall stand as regular and punctual.
165  Failure by the Charterers to pay the hire within *3 (Three)*   days of their receiving the Owners' notice as
166  provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above.

167  (c)  *Last Hire Payment*

168  Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate
169  payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and
170  the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking
171  into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for
172  the Owners' account before redelivery.  Should same not cover the actual time, hire is to be paid for the
173  balance, day by day, as it becomes due. When the Vessel has been redelivered, any
174  difference is to be refunded by the Owners or paid by the Charterer's, as the case may be

175  (d)  *Cash Advances*

176  Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required
177  by the Owners, subject to 2 1/2 *percent* commission and such advances shall be deducted from the hire.
178  The Charterers, however, shall in no way be responsible for the application of such advances.
     **Cash advances requested by Master and paid through Charterers will be made at a time and place**
     **convenient to Charterers.**
179  **12.  Berths**

180  The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that
181  Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat
182  ~~at any time of tide.~~

This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S A ). Inc., using the BIMCO Charter Party Editor.   **4**
Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document,  which is not clearly visible, the original ASBA
approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document

183   13.  **Spaces Available**

184   (a) The whole reach  of the Vessel's holds, decks, and other cargo spaces (not  more than  she can
185   reasonably and safely  stow and carry),  also accommodations for supercargo,  if carried, shall  be at the
186   Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,
187   apparel, furniture, provisions, stores and fuel.

188   (b) In the event of deck cargo  being carried,  the Owners are to  be and  are hereby  indemnified  by the
189   Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a
190   result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.
     *Any extra insurance to be for Charterers' account.*
191   14.  **Supercargo and Meals**

192   The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'
193   risk and see that voyages are performed with due despatch. He is to be furnished with free
194   accommodation  and same fare as  provided for the Master's table,  the Charterers  paying  at the rate of
195       *US$ 15,00*                  per day. The Owners shall victual pilots and customs officers, and also, when
196   authorised by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,
197   Charterers paying at the rate of **US$ 10,00**       per meal for all such victualling..

198   15.  **Sailing Orders and Logs**

199   The Charterers shall  furnish  the Master from  time to time with  all requisite  instructions and  sailing
200   directions **when necessary**, in writing, in the English language, and the Master shall keep full and correct deck  and engine
201   logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the
202   Charterers, their agents or supercargo, when required, with  a  true copy of such deck  and engine logs,
203   showing the course of the Vessel, distance run **other navigational information, cargo operations** and the  consumption of bunkers. Any log extracts
204   required by the Charterers shall be in the English language.

205   16.  **Delivery/Cancelling**

206   If required by the Charterer's, time shall not commence before **12th November, 2007–00.01 hours** and should  the
207   Vessel not be ready for delivery on or before **20th November, 2007-24.00 hours**  but not later than
208   the Charterers shall have the option of cancelling this Charter Party.

209   *Extension of Cancelling*
210   If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready
211   for delivery  by  the cancelling date,  and  provided the Owners  are able to state with  reasonable certainty
212   the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is
213   expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will
214   cancel the Charter Party. Should the Charterers elect not to cancel,  or should they fail to reply within two
215   days or by the  cancelling date, whichever shall first occur,  then the  seventh day after the expected date
216   of readiness for delivery as notified  by the Owners shall  replace  the  original cancelling date. Should  the
217   Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers in
218   accordance with this Clause.
219   17.  **Off Hire**

220   In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency
221   of stores, fire,  breakdown of, or  damages to hull,  machinery or equipment,  grounding, detention  by the
222   arrest of the Vessel,  (unless such arrest is caused  by events for which  the Charterers,  their servants,
223   agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless
224   resulting from inherent vice, quality or defect of the cargo, dry docking for the purpose of examination or
225   painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of
226   hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back
227   during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident
228   to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time
229   of her deviating or putting back until she is again in the same or equidistant position from the destination

This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S A ). Inc., using the BIMCO Charter Party Editor.
Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document,  which is not clearly visible, the original ASBA
approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document

NYPE 93 Page

5

230 and the voyage resumed there from. All bunkers used by the Vessel while off hire shall be for the Owners'
231 account.  In the event of the Vessel being driven into port or to anchorage through stress of weather,
232 trading to shallow harbours or to rivers or ports with bars, any detention of the Vessel and/or expenses
233 resulting from such detention shall be for the Charterers' account.  If upon the voyage the speed be
234 reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and
235 the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be
236 deducted from the hire.

237 18. **Sublet**

238 Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of
239 the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this
240 Charter Party, *subject to Owners' approval of the subletters which not to be unreasonably withheld*

241 19. **Drydocking**

242 The Vessel was last dry-docked *January 2006*

243 *(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter
244 at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for
245 bottom cleaning and painting and/or repair as required by class or dictated by circumstances.

246 ~~*(b) Except in case of emergency no drydocking shall take place during the currency of this Charter~~
247 ~~Party.~~

248 * Delete as appropriate

249 20. **Total Loss**

250 Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or
251 being last heard of) shall be returned to the Charterers at once.

252 21. **Exceptions**

253 The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the
254 seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always
255 mutually excepted.

256 22. **Liberties**

257 The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels
258 in distress, and to deviate for the purpose of saving life and property.

259 23. **Liens**

260 The Owners shall have a lien upon all cargoes *freights* and all sub-freights and/or sub-hire for any amounts due
261 under this Charter Party, including general average contributions, and the Charterers shall have a lien on
262 the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be
263 returned at once.
264 The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,
265 which might have priority over the title and interest of the Owners in the Vessel.  The Charterers
266 undertake that during the period of this Charter Party, they will not procure any supplies or necessaries
267 or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.

268 24. **Salvage**

269 All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting
270 Owners' and Charterers' expenses and crew's proportion.

This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S A ). Inc., using the BIMCO Charter Party Editor.   6
Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document,  which is not clearly visible, the original ASBA
approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document

NYPE 93 Page

271   25. **General Average**

272   General average shall  be adjusted according to York-Antwerp Rules 1974, as amended 1990,  or any
273   subsequent modification thereof, in **London**  and settled in     **United States**
274   currency.

275   The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will
276   contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules
277   1974, as amended 1990, or  any subsequent modification thereof  and will include  the  "New Jason
278   Clause" as per Clause 31.

279   Time charter hire shall not contribute to general average.

280   26. **Navigation**

281   Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners
282   shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats,  insurance, crew,
283   and all other matters, same as when trading for their own account.

284   27. **Cargo Claims**

285   Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club
286   New York Produce Exchange Agreement of February 1970, as amended May,   1984, or any subsequent
287   modification or replacement thereof.

288   28. **Cargo Gear and Lights**

289   The Owners shall maintain the cargo handling gear of the Vessel which is as follows : *Detailed in Cl. 85*
290
291
292
293   providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also
294   provide on the Vessel for night work lights as on board, but all additional lights over those on board shall
295   be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If
296   required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be at the
297   Charterers' disposal during loading and discharging.  In the event of disabled  cargo  handling gear, or
298   insufficient power to operate the same,  the Vessel is to  be  considered  to  be  off hire to  the  extent that
299   time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned
300   thereby, unless such disablement  or insufficiency  of power is caused by  the  Charterers' stevedores.  If
301   required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, *but same not*
      *to exceed vessel's daily hire or part of, in such numbers and/or such period of time as deemed*
      *necessary by Charterers such deficiency in ships gear is rectified to Charterers' satisfaction and the*
      *vessel will remain on hire*   ~~in which~~
302   ~~case the Vessel shall remain on hire~~.

303   29. **Crew Overtime**

304   ~~In lieu of any~~ Overtime payments to officers and crew for work ordered by the Charterers or their agents,
305   ~~the Charterers shall pay the Owners, concurrently with the hire~~————Nil————————~~per month~~
306   ~~or pro rata.~~ *to be for Owners' account.*

307   30. **Bills of Lading**

308   (a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates
309   ~~or tally clerk's~~ receipts. However, the  Charterers *or their Agents* may sign  bills of lading or ~~waybills~~ on behalf
310   of the Master, ~~with the Owner's prior written authority~~, always in conformity with mates ~~or tally clerk's~~ receipts.

311   (b) All bills of lading  or waybills  shall  be without prejudice to this Charter Party and the Charterer's shall
312   indemnify  the  Owners against all  consequences or  liabilities  which  may  arise  from  any  inconsistency

This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S.A.), Inc., using the BIMCO Charter Party Editor.   7
Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document,  which is not clearly visible, the original ASBA
approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document

NYPE 93 Page

313 between this Charter Party and any bills of lading or ~~waybills~~ signed by the Charterer's or by the Master
314 at their request.
315 (c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and
316 Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for
317 any loss, damage, expense or delay howsoever caused."*Charterers have the option to take out insurance*
*cover enabling them to issue under deck Bills of Lading for cargo loaded on deck as well as damages*
*caused by deck cargoes to the vessel's structure shall be for Charterers' account.*

318 31.  **Protective Clauses**

319 This Charter Party is subject to the following clauses all of which are also to be included in all bills of lading
320 or waybills issued hereunder:

321 (a) CLAUSE PARAMOUNT
322 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the
323 United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national
324 legislation as may mandatory apply by virtue of origin or destination of the bills of lading, which shall
325 be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the
326 carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said
327 applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such
328 term shall be void to that extent, but no further."

329 and

330 (b) BOTH-TO-BLAME COLLISION CLAUSE
331 "If the ship comes into collision with another ship as a result of the negligence of the other ship and any
332 act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in
333 the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against
334 all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents
335 loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other
336 or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the
337 other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

338 The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or
339 objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or
340 contact."

341 and

342 (c) NEW JASON CLAUSE
343 "In the event of accident, danger, damage or disaster before or after the commencement of the voyage
344 resulting from any cause whatsoever, whether due to negligence or not, for which, or for the
345 consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods,
346 shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the
347 payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,
348 and shall pay salvage and special charges incurred in respect of the goods.

349 If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship
350 or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover
351 the estimated contribution of the goods and any salvage and special charges thereon shall, if required,
352 be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."

353 and

354 (d) U.S. TRADE - DRUG CLAUSE
355 "In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the
356 Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested
357 narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

358 Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences

This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S.A.), Inc., using the BIMCO Charter Party Editor. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original ASBA approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document

NYPE 93 Page

8

359  of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel
360  harmless and shall keep them indemnified against all claims whatsoever which may arise and be made
361  against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines,
362  as a result of the Charterers' breach of the provisions of this clause shall be for the Charterers' account
363  and the Vessel shall remain on hire.

364  Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this
365  clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable
366  time the Vessel is released and at their expense put up the bails to secure release of the Vessel.

367  The Owners shall remain responsible for all time lost and all expenses incurred,  including fines, in the
368  event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the
369  Vessel's personnel."

370  and

371  (e) WAR CLAUSES
372  "(i) No contraband of war shall be shipped.  The Vessel shall not be required, without the consent of the
373  Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state
374  of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration
375  of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,
376  seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de
377  facto authority or any purported governmental organisation maintaining naval, military or air forces). *Additional
     **War Risk Insurance on hull and machinery and any possible crew war bonus or for Charterers'
     account.**

378  (ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring
379  the Vessel against hull war-risks in an amount equal to the value under her ordinary hull policy but not
380  exceeding a valuation of .  In addition, the Owners may purchase and the
381  Charterers will pay for war-risk insurance on ancillary risks such as loss of hire, freight disbursements,
382  total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a
383  government program, the Vessel shall not be required to enter or remain at any such port or zone.

384  (iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter,
385  or while the Vessel is on hire under this Charter, the Charterer's shall, in respect of voyages to any such
386  port or zone assume the provable additional cost of wages and insurance properly incurred in connection
387  with master, officers and crew as a consequence of such war, warlike operations or hostilities.

388  (iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the
389  Charterers' account."

390  32.  **War Cancellation**

391  In the event of the outbreak of war (whether there be a declaration of war or not) between any two or
392  more of the following countries:*Any NATO members, USA, Libya, Algeria, Tunisia, Russia and
     People Republic of China*

393
394
395
396  either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall
397  redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after
398  discharge thereof at destination, or.  if debarred under this Clause from reaching or entering it,  at a near
399  open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she
400  then is; or, if at sea, at a near open and safe port as directed by the Owners.  In all cases hire shall
401  continue to be paid in accordance with Clause 11  and except as aforesaid all other provisions of this
402  Charter Party shall apply until redelivery.

403  33.  **Ice**

404  The Vessel shall not be required to enter or remain in any icebound port or area,  nor any port or area

This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S A ). Inc., using the BIMCO Charter Party Editor.
Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document,  which is not clearly visible, the original ASBA
approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document

NYPE 93 Page

9

405 where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is
406 risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and
407 remain in the port or area or to get out after having completed loading or discharging. ~~Subject to the~~
408 ~~Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her,~~
409 ~~construction and ice class.~~

410 **34.  Requisition**
411 Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter
412 Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid
413 by the said government in respect of such requisition period shall be retained by the Owners. The period
414 during which the Vessel is on requisition to the said government shall count as part of the period provided
415 for in this Charter Party.
416 If the period of requisition exceeds **2 (Two)**        months, either party shall have the option
417 of cancelling this Charter Party and no consequential claim may be made by either party.

418 35.  **Stevedore Damage**

419 Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all
420 damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their
421 agents in writing as soon as practical but not later than 48 hours after any damage is discovered, *except for*
*hidden damages which to be notified to Charterers as soon as its discovered.* Such
422 notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent
423 of such damage.

424 (a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew
425 and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs
426 of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed
427 and if required passed by the Vessel's classification society.

428 (b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option
429 before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will
430 be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for
431 which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the
432 Owners' work.

433 36.  **Cleaning of Holds**

434 The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between
434 voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by
436 local regulations, at the rate of *USD 350 (THREEHUNDRED50)* per hold. *Excluding removal disposal at*
*lashing material/dunnage/debris*
437 In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not
438 accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver
439 the Vessel with unclean/upswept holds against a lumpsum payment of *USD 2,650.00* in lieu of cleaning.
*Excluding removal disposal of lashing material/dunnage/debris.*

440 37.  *Taxes*

441 Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners
442 resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter
443 Party including any taxes and/or dues on cargo and/or freights and/or sub-freights and/or hire (excluding
444 taxes levied by the country of the flag of the Vessel or the Owners).

445 38.  **Charterers'  Colors**

446 ~~The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their~~
447 ~~own markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter~~
448 ~~Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers~~
449 ~~shall be for the Charterers' account.~~

This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S.A.) Inc., using the BIMCO Charter Party Editor.
Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document, which is not clearly visible, the original ASBA
approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document

NYPE 93 Page

10

450  39. **Laid up Returns**

451  The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their
452  underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum
453  period of 30 days if on full hire for this period or pro rata for the time actually on hire. ***Subject insurance cover.***

454  40. **Documentation**

455  The Owners shall provide any documentation relating to the Vessel that may  be required to permit the
456  Vessel  to  trade  within  the  agreed  trade  limits,  including,  but  not  limited  to  certificates  of  financial
457  responsibility for oil pollution provided such oil pollution certificates are obtainable from the Owners'
458  P & I. club, valid international tonnage certificate,  Suez and Panama tonnage certificates, valid certificate
459  of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.

460  41. **Stowaways**

461  (a)  (i)  ~~The Charterers warrant to exercise due care and diligence  in  preventing  stowaways in gaining~~
462  ~~access to the Vessel by means of secreting away in the goods and/or containers shipped by the~~
463  ~~Charterers.~~

464  (ii)  ~~If, despite the exercise of due care and diligence by the Charterers, stowaways have gained~~
465  ~~access to the Vessel by means of secreting away in the goods and/or containers shipped by the~~
466  ~~Charterers, this shall amount to breach of charter for the consequences of which the Charterers~~
467  ~~shall  be  liable  and  shall  hold  the  Owners  harmless  and  shall  keep  them  indemnified  against all~~
468  ~~claims whatsoever which  may arise and be made against them.  Furthermore,  all time lost and all~~
469  ~~expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account~~
470  ~~and the Vessel shall remain on hire.~~

471  (iii)  ~~Should  the Vessel be  arrested as  a  result of the Charterers'  breach  of charter according  to~~
472  ~~sub-clause (a)(ii) above, the Charterers  shall take all reasonable steps to  secure that,  within  a~~
473  ~~reasonable time, the Vessel is released and at their expense put up bail to secure release of the~~
474  ~~Vessel.~~

475  (b)  (i)  If,  despite  the  exercise  of  due  care  and  diligence  by  the  Owners,  stowaways  have  gained
476  access to the Vessel by means other than secreting away in the goods and/or containers shipped
477  by the Charterers, all time lost and all expenses whatsoever and  howsoever incurred,  including
478  fines, shall be for the Owners' account and the Vessel shall be off hire.

479  (ii)  Should the Vessel be  arrested as a  result of stowaways having  gained access to the Vessel
480  by means other than secreting away in the goods and/or containers shipped by the Charterers,
481  the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel
482  is released and at their expense put up bail to secure release of the Vessel.

483  42. **Smuggling**

484  In the event of smuggling by the  Master, Officers and/or crew, the  Owners shall  bear the cost of any
485  fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.

486  43. **Commissions**

487  ~~A commission of~~————————*percent* ~~is  payable by the Vessel and the Owners to~~
488
489
490
491  ~~on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.~~

This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S A ). Inc., using the BIMCO Charter Party Editor.
Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document,  which is not clearly visible, the original ASBA
approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document  11

492  44 . **Address Commission**

493  An address commission of *1,25* percent is payable to ***Charterers.***
493
494
495  ***1,25 per cent commission on hire to be payable to Visser & Visser Chartering B.V. of Rotterdam.***
496  on hire earned and paid under this Charter.


497  45. **Arbitration**

498  (a)  ~~NEW YORK~~
499  ~~All disputes arising out of this contract shall be arbitrated at New York in the following manner, and~~
500  ~~subject to U.S. Law:~~
501  ~~One Arbitrator is to be appointed by each of the parties hereto and a third by the two co chosen. Their~~
502  ~~decision or that of any two of them shall be final, and for the purpose of enforcing any award, this~~
503  ~~agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with~~
504  ~~chipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of~~
505  ~~Maritime Arbitrators Inc.~~

506  ~~For disputes where the total amount claimed by either party does not exceed US $~~                    **
507  ~~the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society~~
508  ~~of Maritime Arbitrators Inc.~~

509  (b)  LONDON
510  All disputes arising out of this contract shall be arbitrated at London and, unless the parties  agree
511  forthwith on a single Arbitrator,  be referred to the final arbitrament of two Arbitrators carrying on business
512  in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,
513  one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No
514  award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as
515  above, unless objection to his action be taken before the award is made. Any dispute arising hereunder
516  shall be governed by English Law.

517  For disputes where the total amount claimed by either party does not exceed US $ ** *25.000,00*
518  the arbitration shall be conducted  in accordance with the Small Claims Procedure of the London Maritime
519  Arbitrators Association.

520  *  Delete para (a) or (b) as appropriate

521  ** Where no figure is supplied in the blank space this provision only shall be void but the other provisions
522  of this clause shall have full force and remain in effect.

523  If mutually agreed, clauses            *46*      *to*       *88*       , both inclusive, as attached hereto are fully
524  incorporated in this Charter Party.


525                                         APPENDIX " A"
526  ~~To Charter Party dated~~
527  ~~Between~~                                              Owners
528  and                                                      Charterers
529  ~~Further details of the Vessel:~~


**The Owners**                                  **The Charterers**


This Charter Party is a computer generated copy of the NYPE 93 form, printed under license from the Association of Brokers & Agents (U.S A ). Inc., using the BIMCO Charter Party Editor.
Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the preprinted text of this document,  which is not clearly visible, the original ASBA
approved document shall apply. ASBA/BIMCO assume no responsibility for any loss or damage caused as a result of discrepancies between the original ASBA document and this document   12

NYPE 93 Page

# EXHIBIT B



IN THE MATTER OF THE ARBITRATION ACT 1996


AND


IN THE MATTER OF AN ARBITRATION


BETWEEN


EXUMA NAVIGATION COMPANY INC          **Claimants**
of Florida                            (Charterers)


and


PENINSULA ENTERPRISES SPA             **Respondents**
of Sorrento, Naples, Italy      (Disponent Owners)



M.V. "MEVLUT DOVEN"



CHARTER PARTY DATED 6 NOVEMBER 2007



FIRST FINAL ARBITRATION AWARD

- 2 -

WHEREAS:

1.  By an amended NYPE 1946 Charter Party dated
6 November 2007 the Claimants (hereinafter
referred to as "the Charterers") chartered the
"MEVLUT DOVEN" from the Respondents (hereinafter
referred to as "the Owners") for a timecharter
period of 12 months 15 days more or less in the
Charterers' option they having the option of a
further two 6 month periods again 15 days more
or less as before. Delivery was at Algeciras
with redelivery dropping last outward sea pilot
Mediterranean/Black Sea/Continent/Skaw range.

2.  Clause 45(b) of the said Charter Party
provided:-

"LONDON

All disputes arising out of this contract shall
be arbitrated at London and, unless the parties
agree forthwith on a single Arbitrator, be
referred to the final arbitrament of two
Arbitrators carrying on business in London who
shall be members of the Baltic Mercantile &
Shipping Exchange and engaged in Shipping, one
to be appointed by each of the parties, with
power to such Arbitrators to appoint an Umpire.
No award shall be questioned or invalidated on
the ground that any of the Arbitrators is not
qualified as above, unless objection to his
action be taken before the award is made. Any
dispute arising hereunder shall be governed by
English Law...".

3. Disputes did arise between the parties as
detailed hereunder and the Charterers appointed
me, the undersigned, Mark Hamsher of 18c Ensign

- 3 -

Street, London E1 8JD and the Owners appointed
me, the undersigned, Timothy Rayment of 47
Castelnau, London SW13 9RT and as arbitrators
respectively. We are Full Members of the London
Maritime Arbitrators Association ("LMAA") and
The Baltic Exchange, London.

4.   The seat of this arbitration is London,
England.

5.   The Charterers had various heads of claim.
They claimed loss of earnings in an amount of
US$1,467,779.70 and indemnities for liabilities
to sub-charterers arising out of the vessel's
non-completion of the 3rd voyage to Callao,
Peru. They also claimed an amount of
US$251,308.39 in respect of a balance of hire
shown to be due and owing to the Charterers in a
final hire statement prepared by the Owners. A
copy of that final hire statement was adduced in
evidence. The Charterers applied to us for an
Interim Award in that amount. This Award is
concerned solely with that application with the
other claims being left over for future
determination. The Charterers additionally
claimed interest and costs.

6.   The Charterers served their claim
submissions on 27 August 2009 which, as we have
said above, included their application for an
Interim Award.

7.   On 2 September, Timothy Rayment, on behalf
of the Tribunal, sent an email to the Owners
wherein he made an Order that they serve defence
submissions to the application for an Interim
Award by 11 September. They were advised
further that if they did not respond within that

- 4 -

deadline a Final and Peremptory Order of short duration with appropriate sanctions would follow.

No defence was served within the time limit.

8.   On 14 September, on application from the Charterers, Timothy Rayment, on behalf of the Tribunal, sent an email to the Owners wherein he made a Final and Peremptory Order that they serve their defence to the Interim Award application by 18 September 2009 failing which we would proceed to consider the application.

9.   The Owners responded on 18 September stating that in a final hire statement dated 12 February 2009 the Charterers had shown the balance due to them as being only US$243,906.77.   Their solicitors confirmed on behalf of the Owners that the Charterers' claim for overpaid hire was admitted in that amount and no more; defence submissions for any balance or other heads of claim would be served at a later stage in the proceedings.

10.   Without prejudice to their right to pursue the balance of their claims at a future date, on 24 September the Charterers amended their application for an Interim Award in the reduced and agreed amount of US$243,869.24.

11.   The following Addendum No.1 and Clauses of the Charter Party are relevant to the issues in this arbitration:-

ADDENDUM No.1

" - The daily hire under this Charter Party

- 5 -

shall be as follows:

<u>1ST YEAR</u>

US$6,100,00...nett...US$6,252,00...-2,5 per cent)

<u>2ND PERIOD:</u>

6 Months plus US$100,00 (6.200,00 nett)...
(..6.355,00... - 2.5 per cent)

<u>3RD PERIOD:</u>

6 Months plus US$100,00 (6.300,00 nett)...
(..6.457.00... - 2.5 per cent)..."

<u>CLAUSES.</u>

" 1.   <u>Duration</u>

The Owners agree to let and the Charterers
agree to hire the Vessel from the time of
delivery for a period of 12 months/15 days more
or less in Charterers' option further options
in Charterers' option 6/option 6 months 15 days
more or less in Charterers' option on each
period...

  2.   <u>Delivery</u>

The Vessel shall be placed at the disposal of
the Charterers at one safe port Algeciras,
...The Vessel on her delivery shall be ready to
receive cargo with clean-swept holds and tight,
staunch, strong and in every way fitted for
ordinary cargo service...

- 6 -

6.  **Owners to Provide**

... The Owners...shall maintain the Vessel's
class and keep her in a thoroughly efficient
state in hull, machinery and equipment for and
during the service...

10.  **Rate of Hire/Redelivery Areas and Notices**

The Charterers shall pay for the use and hire
of the said Vessel at the rate of... U.S.
currency, daily commencing on and from the day
of her delivery, as aforesaid, and at and after
the same rate for any part of a month...

17.  **Off Hire**

In the event of loss of time from deficiency
and/or default and/or strike of officers or
crew, or deficiency of stores, fire, breakdown
of, or damages to hull, machinery or equipment,
grounding, detention by the arrest of the
Vessel, (unless such arrest is caused by events
for which the Charterers, their servants,
agents or subcontractors are responsible), or
detention by average accidents to the Vessel or
cargo unless resulting from inherent vice,
quality or defect of the cargo, drydocking for
the purpose of examination or painting bottom,
or by any other similar cause preventing the
full working of the Vessel, the payment of hire
and overtime, if any, shall cease for the time
thereby lost.  Should the Vessel deviate or put
back during a voyage, contrary to the orders or
directions of the Charterers, for any reason
other than accident to the cargo or where
permitted in lines 257 to 258 hereunder, the
hire is to be suspended from the time of her

- 7 -

deviating or putting back until she is again in
the same and equidistant position from the
destination and the voyage resumed therefrom.
All bunkers used by the Vessel while off hire
shall be for the Owners' account.  In the event
of the Vessel being driven into port or to
anchorage through stress of weather, trading to
shallow harbors or to rivers or ports with
bars, any detention of the Vessel and/or
expenses resulting from such detention shall be
for the Charterers' account.  If upon the
voyage the speed be reduced by defect in, or
breakdown of, any part of her hull, machinery
or equipment, the time so lost, and the cost of
any extra bunkers consumed in consequence
thereof, and all extra proven expenses may be
deducted from the hire.

27.  **Cargo Claims**

Cargo claims as between the Owners and the
Charterers shall be settled in accordance with
the Inter-Club New York Produce Exchange
Agreement of February 1970, as amended May,
1984, or any subsequent modification or
replacement thereof.

31.  **Protective Clauses**

This Charter Party is subject to the following
clauses all of which are also to be included in
all bills of lading or waybills issued
hereunder.

(a) CLAUSE PARAMOUNT

This bill of lading shall have effect subject
to the provisions of the Carriage of Goods by

- 8 -

Sea Act of the United States, the Hague Rules,
or the Hague-Visby Rules, as applicable, or
such other similar national legislation as  may
mandatorily apply by virtue of origin or
destination of the bills of lading, which shall
be deemed to be incorporated herein and nothing
herein contained shall be deemed a surrender by
the carrier of any of its rights or immunities
or an increase of any of its responsibilities
or liabilities under said applicable Act.  If
any term of this bill of lading be repugnant to
said applicable Act to any extent, such term
shall be void to that extent, but no further.

## Clause 48

The Charterers to pay Owners Lumpsum
US$1.000,-- per month pro rata for telegrams,
radio calls and entertainment for all matters
in the Charterers' interest.

## Clause 51

Should the vessel be offhire for more than 25
days, the Charterers shall have the option of
cancelling this Charter Party.  Hire paid in
advance to be refunded by the Owners
immediately.

## Clause 55 - Performance Clause

Owners guarantee that the vessel is steaming
about 10-11 knots under good weather conditions
with Beaufort 3 or similar sea condition,
without adverse currents and negative
influence of swell.

Owners guarantee the bunker consumption as per

- 9 -

vessel's description.  If the vessel consumes
bunkers in addition to the described
consumption, Charterers to deduct proven costs
for any overconsumption from the hire.

Clause 59

Vessel to deliver with minimum quantity of
bunkers on board to reach a large nearby  port.
Expected about ??? per metric ton IFO and about
??? metric ton MGO and Charterers to redeliver
with about same quantities on board as on board
by the time of delivery...

Clause 82 Weather Routing

...For the purpose of this Charter Party good
weather conditions to be defined as not
exceeding Beaufort Scale 3.  When indicting a
speed of "about" this gives the vessel an
allowance of 0.5 knots.

12.   Pursuant  to the Charter  Party,  it  was
common  ground  the vessel  delivered  into  the
Charterers' service at Algeciras at 1630   UTC on
29  November 2007 and redelivered to the  Owners
at 2359 UTC on 25 November 2008.  The Charterers
adduced  a  copy  of  the Owners'  Final   Hire
Statement  which  showed a balance due  to  them
(the  Charterers) of US$251,308.39.  As  already
mentioned,  liability  for the  reduced  sum  of
US$243,869.24  was  admitted in an email  of   18
September sent on behalf of the Owners by  their
London solicitors.

13.  The Charterers, having been successful, are
awarded interest as particularised below with  a
commencement date of 12 February 2009 which

- 10 -

complies with the application made on behalf of the Charterers by their solicitors.

14.   The Charterers, having been successful, are awarded their costs together with the costs of this our First Final Arbitration Award and we reserve to ourselves the power to determine their costs as set out in Section 65 of the Arbitration Act 1996.

15.   NOW WE, the said arbitrators Mark Hamsher and Timothy Rayment having taken upon ourselves the burden of this arbitration, having carefully and conscientiously read and considered the submissions and documents and evidence the parties adduced and discussed the matter between us and found ourselves in agreement

DO HEREBY MAKE, ISSUE AND PUBLISH THIS OUR FIRST FINAL ARBITRATION AWARD, NAMELY

A)   WE FIND AND HOLD that the Charterers' claim succeeds in full in the sum of US$243,869.24.

B)   WE THEREFORE AWARD AND ADJUDGE that the Owners shall forthwith pay to the Charterers the sum of US$243,869.24 (two hundred and forty three thousand eight hundred and sixty nine United States Dollars and twenty four cents) together with interest thereon at the rate of 4.00 (four) per cent per annum compounded at three monthly rests from 12 February 2009 until the date of payment in full by the Owners to the Charterers.

C)   WE FURTHER AWARD AND ADJUDGE that the Owners shall bear their own and the Charterers' costs

- 11 -

in the reference on the standard basis and we hereby reserve to ourselves the power to determine those costs as set out in Section 65 of the Arbitration Act 1996. The Owners shall additionally bear the costs of this our First Final Arbitration Award which we settle in the sum of £3,470.00 (three thousand four hundred and seventy pounds Sterling) **PROVIDED ALWAYS** that if, the in the first instance, the Charterers shall have paid any part of this our First Final Arbitration Award they shall be entitled to an immediate refund from the Owners of the sum paid together with interest thereon at the rate of 4.00 (four) per cent per annum compounded at three monthly rests from the date of payment until the date of repayment in full by the Owners to the Charterers.

D)   **WE DECLARE THAT THIS AWARD** is final as to the matters determined herein and we reserve to ourselves the power to make a further Award or Awards as may be appropriate in respect of the outstanding differences between the parties.

**GIVEN UNDER OUR HANDS** on this 2nd day of October 2009.


......................   ......................
Mark Hamsher                Witness


......................   ......................
Timothy Rayment             Witness